**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2016-NMCA-093**

**Filing Date: August 31, 2016**

**Docket No. 34,327**

**IN THE MATTER OF THE ADOPTION**
**PETITION OF DARLA D. and PATTY R.,**

      **Petitioners-Appellees,**

**v.**

**GRACE R.,**

      **Respondent-Appellant,**

**and**

**IN THE MATTER OF TRISTAN R.,**

      **Child.**

**APPEAL FROM THE DISTRICT COURT OF MORA COUNTY**
**Gerald E. Baca, District Judge**

Caren I. Friedman
Santa Fe, NM

Brown & Gallegos
Flora Gallegos
Las Vegas, NM

for Appellees

Jane B. Yohalem
Santa Fe, NM

for Appellant

Law Office of Aida Medina Adams
Aida Medina Adams

1

Santa Rosa, NM

Guardian Ad Litem

## OPINION

**VANZI, Judge.**

**{1}**     Grace R. (Mother) appeals from the district court's letter decision and decree of adoption and termination of parental rights, terminating her parental rights to Tristan R. (Child) and granting the verified petition for adoption and termination of parental rights (the petition) filed by Darla D. and Patty R. to adopt Child pursuant to the provisions of the Adoption Act, NMSA 1978, §§ 32A-5-1 to -45 (1993, as amended through 2012). Mother challenges the letter decision and decree on numerous grounds, including that her constitutional and statutory rights were violated and that there was insufficient evidence to support the termination of her parental rights. We agree with Mother that multiple procedural and constitutional violations infected the proceedings below. We further conclude that the district court's rulings that Mother abused and neglected Child and that the conditions and causes of such neglect and abuse are unlikely to change in the foreseeable future are not, as they must be, supported by clear and convincing evidence. We therefore reverse.

## BACKGROUND

**{2}**     We begin with an overview of the factual and procedural background. Additional details necessary to our analysis of particular issues are provided in the discussion section below.

**{3}**     Mother, who suffers from depression and post-traumatic stress disorder as well as a physical illness, has been receiving support and therapy services through Life Link since about August 2009. In May 2013 Life Link lost funding for the program that subsidized Mother's rent, requiring Mother to move from the home in Santa Fe, New Mexico that she had been sharing with her boyfriend, Child, and Child's older sister. Concerned about finding housing she could afford, Mother became depressed and overwhelmed. On the morning of May 23, 2013, with a few days left to move and her daughter getting ready for summer school, Mother got into an argument with her boyfriend and began yelling at him. When he tried to restrain her, Mother "scratched and bit at him[.]" The police were called, and Mother was arrested and jailed for five days. She pleaded guilty to disorderly conduct and was sentenced to ten hours of community service and six months of unsupervised probation.

**{4}**     While Mother was in jail, her children remained with her boyfriend. The Children, Youth and Families Department (CYFD) checked on the welfare of the children and determined that they were safe in his care. When Mother was released from jail, she contacted the Santa Fe CYFD office and asked CYFD worker Denise Shirley for help.

2

Mother explained to Shirley that she felt her emotional stability was at risk: She was going to lose her home and had no family support, and she was requesting services offered by CYFD because they had been helpful in the past.

**{5}** CYFD and Mother agreed on a safety plan for the care of the children while Mother sought intensive treatment from Life Link to address her anxiety disorder and to help with coping skills. The safety plan provided that Child's older sister would fly to New Jersey to live with her biological father and Child would reside with his paternal grandmother, Darla D. (Grandmother). Although the children were not in CYFD custody, the safety plan was to remain "in effect until further reassessment by the family's CYFD caseworker."

**{6}** On May 31, 2013, Grandmother and her partner, Patty R., (collectively, Petitioners) picked up Child at Mother's residence and took him to their home in Mora, New Mexico. While Child was living with Petitioners, Mother saw a counselor and caseworker at Life Link. She was placed on a waiting list for the Life Link intensive program but participated in the program as a "casual member" between July and September, attending therapy three times a week. In September 2013 Mother became an official member of the program. At the time of trial, Mother continued to receive counseling through Life Link.

**{7}** During the summer of 2013, Mother talked to Child on the phone at least once a week. Between August and September, she also saw Child four times when Grandmother was in Santa Fe with him. Later, Mother started calling Child nightly. However, Petitioners told Mother that the nightly calls were disruptive. They set up a schedule for Mother to call two days a week but sometimes did not answer the phone. Mother left messages stating her frustration with not being able to talk to Child.

**{8}** In early October 2013 Mother told Grandmother that she wanted to begin to reintegrate Child back into her life and that she was hoping to have him back in Santa Fe after Christmas. In November 2013 Grandmother had a disagreement with Mother concerning how often Mother could speak with Child and, shortly thereafter, Mother learned that Grandmother was trying to "serve [her] with something." In fact, Grandmother had filed a petition for a restraining order (TRO petition) against Mother in the San Miguel County District Court, seeking to prevent Mother from having any contact with her or Child. The TRO petition was dismissed in early December 2013, after the district court held a hearing and concluded that Mother should visit Child and that phone calls should occur regularly. At that point, Mother had not seen Child in about a month and a half.

**{9}** In November 2013 after the TRO petition was filed, Mother was served with Petitioners' petition to terminate parental rights and to adopt Child in a closed adoption. The petition, which had been filed almost a month earlier in a separate proceeding in the district court, sought termination of the parental rights of Child's biological parents "on the basis of voluntary relinquishment of parental rights" and requested a judgment declaring the closed adoption of Child by Petitioners.

3

**{10}** On March 3, 2014, after a hearing, the district court appointed a guardian ad litem (GAL)—selected by Petitioners—for Child. The court held a merits hearing on the petition (for ease of reference, trial) on July 15 and 25, 2014, and entered its letter decision nearly three months later, on October 8, 2014. The letter decision contains no factual findings and merely states the following conclusions: Child "has been abused or neglected while in the care and custody of [Mother], and the conditions and causes of the neglect or abuse are unlikely to change in the foreseeable future"; Child "has been abandoned by his parents in that [C]hild has been placed in the care of [P]etitioners by [Mother]"; and "all of the conditions set forth in Section 32A-5-15(B)(3)(a-e) . . . exist and have not been rebutted by [Mother.]" No party filed proposed findings of fact and conclusions of law. The decree of adoption and termination of parental rights was filed on November 5, 2014. This appeal followed.

## DISCUSSION

**{11}** Our courts have repeatedly recognized that a biological parent's right to the care and custody of her child implicates fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *See State ex rel. Children, Youth & Families Dep't v. John R.*, 2009-NMCA-025, ¶ 27, 145 N.M. 636, 203 P.3d 167 (stating that "a parent has a fundamental interest in the care, custody, and control of his or her children"); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (recognizing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *State ex rel. Children, Youth & Families Dep't v. Joe R.*, 1997-NMSC-038, ¶ 29, 123 N.M. 711, 945 P.2d 76 ("[A parent's] rights and obligations . . . are protected by his constitutional right to due process."); *Ronald A. v. State ex rel. Human Servs. Dep't*, 1990-NMSC-071, ¶ 3, 110 N.M. 454, 797 P.2d 243 (noting that a parent's right to custody is constitutionally protected). Although a parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *See In re Adoption of Francisco A.*, 1993-NMCA-144, ¶ 20, 116 N.M. 708, 866 P.2d 1175 ("It is well established in New Mexico that parents do not have absolute rights in their children; rather parental rights are secondary to the best interests and welfare of the children."); *In re Adoption of Bradfield*, 1982-NMCA-047, ¶ 16, 97 N.M. 611, 642 P.2d 214 (noting that "[t]he paramount issue in an adoption proceeding . . . is the welfare of the child"). Nevertheless, to comply with due process requirements, actions to terminate a parent's rights "must be conducted with scrupulous fairness." *State ex rel. Children, Youth & Families Dep't v. Lorena R.*, 1999-NMCA-035, ¶ 19, 126 N.M. 670, 974 P.2d 164 (alteration, internal quotation marks, and citation omitted). The provisions of the Adoption Act governing proceedings for adoption of children and concurrent termination of parental rights, discussed below, reflect the constitutional dimension of the rights at stake.

**{12}** Mother makes several arguments on appeal. She contends that the district court disregarded due process and statutory requirements for proceedings to terminate parental rights, including by failing to inform her of her right to court-appointed counsel and requiring her to share the cost of the GAL. She argues that the district court abused its discretion by (1) admitting into evidence and relying on the GAL's investigatory report,

which included portions of the CYFD file; (2) failing to exclude hearsay and double hearsay in the testimony of CYFD worker Kurt Smith; and (3) allowing Child's therapist to testify despite her refusal to produce her treatment notes. Mother also contends that the decision terminating her parental rights is not supported by clear and convincing evidence. We agree. We also conclude that the petition was improperly filed and should have been dismissed at the inception of this case.

**{13}**     We note at the outset that it appears that this matter was erroneously treated as an abuse and neglect case under the Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -34 (1993, as amended through 2016), rather than as a proceeding under the Adoption Act for adoption and concurrent termination of parental rights. We begin by discussing the requirements for proceedings under the Adoption Act, and some of the multitude of failures by Petitioners, the GAL, and the district court to follow those requirements. We then address errors and abuses of discretion in the conduct of the trial that led to the improper termination of Mother's parental rights.

**Failure to Follow the Strict Requirements for Adoption Requires Reversal**

**{14}**     The record reveals a host of violations of the Adoption Act, any one of which would warrant reversal. Our review is de novo. *Helen G. v. Mark J. H.*, 2008-NMSC-002, ¶ 7, 143 N.M. 246, 175 P.3d 914; *State ex rel. Children, Youth & Families Dep't v. Carl C.*, 2012-NMCA-065, ¶ 8, 281 P.3d 1242. To the extent that some of these issues have been raised for the first time on appeal, we review for fundamental error. *See State ex rel. Children, Youth & Families Dep't v. Paul P., Jr.*, 1999-NMCA-077, ¶ 14, 127 N.M. 492, 983 P.2d 1011 (stating that "termination of parental rights cases can be candidates for fundamental error analysis").

**{15}**     The overarching purpose of the Adoption Act is to "establish procedures to effect a legal relationship between a parent and adopted child" and to "ensure due process protections." Section 32A-5-2(A), (C). Only an "individual who has been approved by the court as a suitable adoptive parent *pursuant to the provisions of the Adoption Act*" may adopt. Section 32A-5-11(B)(1) (emphasis added). The record reveals consistent failures to comply with the Adoption Act's requirements. We proceed chronologically, beginning with the petition.

**Requirements for Verified Petition for Adoption**

**{16}**     As relevant here, Section 32A-5-12 of the Adoption Act provides:
>          A.     No petition for adoption shall be granted by the court unless the adoptee was placed in the home of the petitioner for the purpose of adoption:
>
>                     (1) by the department;
>                     (2) by an appropriate public authority of another state;

(3) by an agency; or

(4) pursuant to a court order, as provided in Section 32A-5-13.

. . . .

C.      When an adoptee is not in the custody of the department or an agency, the adoption is an independent adoption and the provisions of this section and Section 32A-5-13 . . . shall apply, except when the following circumstances exist:

. . . .

(2) a relative within the fifth degree of consanguinity to the adoptee or that relative's spouse seeks to adopt the adoptee, and, *prior to the filing of the adoption petition*, the adoptee has lived with the relative or the relative's spouse *for at least one year*[.]

(Emphasis added.)

**{17}**    The language of the Adoption Act is unambiguous. Petitioners could petition for adoption of Child *only* if the requirements of either Section 32A-5-12(A) or (C) were met. To the extent Petitioners imply that Child was "placed" with them under Section 32A-5-12(A)(1), they are wrong. The record is clear and undisputed that CYFD never took custody of Child. Accordingly, CYFD could not "place" him in the home of Petitioners for *any* purpose. *See* § 32A-5-3(K) (" '[D]epartment adoption' means an adoption when the child is in the custody of [CYFD.]"); *see also In re Adoption of Doe*, 1982-NMCA-094, ¶ 47, 98 N.M. 340, 648 P.2d 798 (noting that the mother's act of leaving child with her ex-husband was not a "placement" for purposes of adoption under the Adoption Act). And certainly nothing in the safety plan or the record as a whole shows that CYFD "placed [Child] in the home of [Petitioners] *for the purpose of adoption*[.]" Section 32A-5-12(A) (emphasis added). Indeed, if Child had been "placed" with Petitioners, then the district court should have required pre- and post-placement studies pursuant to Sections 32A-5-14 and -31. The pre-placement study is a written evaluation, paid for by the petitioner, of the adoptive family, the adoptee's biological family, and the adoptee. *See* §§ 32A-5-3(U), -13(B), -14(B). The post-placement report is a written evaluation of the adoptive family and the adoptee after the adoptee is placed for adoption. Section 32A-5-3(T). Here, the court never required any such study at the commencement of the proceeding and, in fact, declared in the decree that none was required, further belying Petitioners' implication that Child was "placed" with them for adoption. In short, Section 32A-5-12(A) did not provide a basis for the petition.

**{18}**    Nor could the petition properly be filed in reliance on Section 32A-5-12(C)(2), as the record makes plain that the threshold requirements of this provision also were not met. The petition, filed on October 23, 2013, states that "[C]hild has lived with . . . Petitioners since May 2013." It is evident from the face of the petition itself, then, that Child had lived with

6

Petitioners for a mere five months, and not "for at least one year" *prior to the filing of the adoption petition*, as the Adoption Act requires. Accordingly, Petitioners' own allegations show that Section 32A-5-12(C)'s statutory prerequisite was not met and that, therefore, they were not entitled to bring an action seeking an independent adoption under the Adoption Act. *See In re Adoption of Webber*, 1993-NMCA-099, ¶ 8, 116 N.M. 47, 859 P.2d 1074 (stating that the one-year residency provision is "a statutory prerequisite to . . . adoption and a safeguard to ensure that the best interests of the child are met by allowing the adoption").

**{19}** Given that the statutory prerequisite was not met, had Petitioners wished to pursue the adoption of Child at any time prior to May 31, 2014, they would have been required to obtain a court order placing Child in their home for the purpose of adoption. *See* § 32A-5-12(A)(4). Such an order requires compliance, not only with Sections 32A-5-14(C) or -31(C), but also with Section 32A-5-13(A), which requires a petitioner to file a request with the court to allow the placement and directs that "[a]n order permitting the placement shall be obtained *prior* to actual placement." (Emphasis added.) Petitioners never sought any such order prior to May 2013.

**{20}** Instead, Petitioners alleged, citing Sections 32A-5-31(C) and 32A-5-14(C), that "[p]lacement is not required because this is a relative adoption within the fifth degree of consanguinity to the adoptee." Petitioners are wrong. First, neither Section 32A-5-14(C) nor -31(C) deals with "placement" but rather, as discussed above, with pre- and post-placement studies, neither of which were ordered by the district court. Moreover, both provisions state that pre- and post-placement reports are "not required in cases in which the child is being adopted by a stepparent, a relative or a person named in the child's deceased parent's will *pursuant to Section 32A-5-12*." Sections 32A-5-14(C) and -31(C) (emphasis added). Thus, the Adoption Act provides that "[n]o petition for adoption shall be granted by the court" unless the requirements of Section 32A-5-12 are met. Section 32A-5-12(A). Sections 32A-5-31(C) and 32A-5-14(C) provide no basis to circumvent those requirements.

**{21}** In summary, the petition was improperly filed, and the district court should have dismissed it immediately as a matter of law for failure to meet the Adoption Act's requirements. Although reversal is mandated for this reason alone, we continue our analysis because the number, severity, and aggregate effect of errors in the conduct of the proceedings below demand our attention and censure.

**Termination Procedures**

**{22}** The district court failed to heed and enforce procedural safeguards applicable to proceedings to terminate parental rights under the Adoption Act. In pertinent part, Section 32A-5-16 requires:

> E.   The court shall, upon request, appoint counsel for an indigent parent who is unable to obtain counsel or if, in the court's discretion, appointment of counsel for an indigent parent is required in the interest of

justice. Payment for the appointed counsel shall be made by the petitioner pursuant to the rate determined by the [S]upreme [C]ourt of New Mexico for court-appointed attorneys.

      F.     The court shall appoint a guardian ad litem for the child in all contested proceedings for termination of parental rights. . . .

      G.     Within thirty days after the filing of a petition to terminate parental rights, the petitioner shall request a hearing on the petition. The hearing date shall be at least thirty days after service is effected upon the parent of the child or completion of publication.

**{23}**    We begin with Subsection (E)'s requirement that the court must appoint counsel for an indigent parent either upon request or in the interest of justice. The record shows that, although the district court was made aware that Mother was indigent, it never informed Mother that it would appoint counsel for her if she was indigent and requested counsel. Mother's indigency became clear at the very first hearing in the case in February 2014. Petitioners' counsel told the court that counsel for Mother was concerned that Mother could not pay half the cost of the GAL to be appointed for Child. Mother's counsel elaborated, stating his concern that Mother could not pay for the GAL because she was on Social Security Disability Income (SSDI) and the amount she received was "barely enough for her to live on." He explained that he was working on the case mostly pro bono. Although Mother had paid him a small amount of money, "this is . . . a largely pro bono case."

**{24}**    We recognize that Mother was not pro se but represented by "largely pro bono" counsel. But we have previously held that "a court must advise a parent in termination proceedings under the adoption provisions of the Children's Code that he or she is entitled to have counsel appointed if indigency can be established." *Chris & Christine L. v. Vanessa O.*, 2013-NMCA-107, ¶ 18, 320 P.3d 16. Given that Mother's indigency was pointed out to the court at the first hearing, it was incumbent upon the court to advise Mother of her statutory right to counsel upon a showing of indigency. As we noted in *Chris & Christine L.*, the right to counsel "is meaningless if the parent is unaware of the right." *Id.* ¶ 17. Not only did the court fail to advise Mother of this statutory right, it inexplicably proceeded to order Mother to pay one-third of the GAL's fee, as discussed below.

**{25}**    We conclude that the court's failure to advise Mother that she would be entitled to appointed counsel—paid for by Petitioners—if she could establish indigency violated her rights under the Adoption Act, was in derogation of her due process rights, and constitutes fundamental error. *See* § 32A-5-2(C) (stating that one purpose of the Adoption Act is to "ensure due process protections"); *Paul P., Jr.*, 1999-NMCA-077, ¶ 15 (stating that "the procedures set out in the Children's Code for termination of parental rights suffice to insure a parent's due process rights"). This established right is viewed by our precedent as critical to the circumstance in which a parent's constitutional right to the care and custody of his or her child is implicated. While pro bono legal representation is both commendable and

8

important to legal proceedings of all sorts in New Mexico, Mother nonetheless was not given an opportunity for appointed counsel that was her right to accept or reject.

**{26}** We next address 32A-5-16(F)'s requirement that the court "shall appoint a guardian ad litem for the child in all contested proceedings for termination of parental rights." As noted, the GAL was contacted and selected by Petitioners' counsel, who had discussed the case with her prior to the hearing on the motion for appointment of a GAL for Child. The record is silent as to what information, if any, the GAL received from Petitioners concerning the case. Nor is there any indication that Mother's counsel or the district court spoke with the proposed GAL before she was appointed. In fact, it is apparent from the transcript that the GAL, who was "new to the district" according to Petitioners' counsel, was not present at the hearing on her appointment. Nothing in the Adoption Act prescribes a method for appointing a GAL. Nevertheless, we think that, in the circumstances presented here, the judicial duty to ensure that procedures implicating a parent's due process rights are conducted with "scrupulous fairness," *see Lorena R.*, 1999-NMCA-035, ¶ 19, required the district court to confirm that the GAL was properly informed as to her responsibilities under New Mexico law, was not biased and was able to adequately represent Child's interest. And we conclude that the district court's apparent failure to inquire about the adequacy of the GAL's representation of Child's interest constitutes an abuse of discretion.

**{27}** We also conclude that the district court abused its discretion in requiring Mother to pay one-third of the cost of the GAL that Section 32A-5-16(F) requires to be appointed "in all contested proceedings for termination of parental rights[,]" despite having been informed that Mother could not afford to pay even a portion of the $150 hourly fee. Accepting Petitioners' representation that the GAL anticipated spending about ten hours on the case, Mother's one-third portion of the fee would have amounted to more than one-third of her total monthly income, which was already "barely enough for her to live on." Even Petitioners' counsel asked if there was a discretionary fund that might be used to assist Mother. But the district court asked Mother's counsel if there were "any resources there to assist her in getting that payment taken care of" and then required Mother to pay one-third of the GAL fee.

**{28}** The Adoption Act prescribes no requirements for payment of GAL fees in contested adoption proceedings, and district courts consequently have broad discretion in apportioning those fees among the parties. But given the representations of counsel for both sides concerning Mother's inability to pay in this case, we conclude that the court abused its discretion in requiring Mother to pay one-third of the GAL fee.

**{29}** The district court, moreover, confused the role of the GAL in this adoption proceeding with that of a GAL in a domestic relations custody dispute, an error that resulted in additional erroneous rulings contributing to the district court's decision to terminate Mother's parental rights. We discuss these rulings and their impact on the court's decision more fully below, but pause here to explain.

9

**{30}**     The Adoption Act states that the court shall appoint a GAL for the child in all contested proceedings. Section 32A-5-16(F) and -33. As set forth in the Children's Code, the duties of the GAL are to "zealously represent the child's best interests in the proceeding for which the [GAL] has been appointed and in any subsequent appeals."[1] NMSA 1978, § 32A-1-7(A) (2005). The Children's Code further requires that "[a]fter consultation with the child, a [GAL] shall convey the child's declared position to the court at every hearing." Section 32A-1-7(D). And it lists certain mandatory duties and responsibilities, including consistent contact with the child and communications with professionals involved in the child's case. Section 32A-1-7(E).

**{31}**     The district court erroneously determined that the GAL's role and duties were governed by Rule 1-053.3(A) NMRA, which allows a court to appoint a GAL in "any proceeding when custody of a minor child is contested under Chapter 40" (Domestic Affairs). While the Adoption Act "ensure[s] due process protections" in proceedings to determine whether to terminate a parent's ties with her child, *see* § 32A-5-2(A), (C), the rule exists to assist the court in determining how both parents should best care for their children. *See* Rule 1-053.3(A) (stating that "[t]he [GAL] serves as an arm of the court and assists the court in discharging its duty to adjudicate the child's best interests"). There are marked differences between the appointment and role of the GAL in the two types of cases. For example, unlike the mandatory requirement to appoint a GAL in a contested adoption/termination of parental rights proceeding, the appointment of a GAL in a domestic relations matter is discretionary. *See id.* (stating that the court "may appoint" a GAL); *see also* Rule 1-053.3(E) (listing seventeen factors to consider in determining whether an appointment will be made). And while Rule 1-053.3(B) requires that the appointment order specify the GAL's role, tasks, duties, and any limitations and allows the parties to agree to adopt the GAL's recommendations, *see* Rule 1-053.3(G), the Adoption Act does not. Given these differences, and for reasons discussed more fully below, we conclude that the district court erred in applying Rule 1-053.3 to the adoption and termination proceeding at issue here.

**{32}**     We briefly address Section 32A-5-16(G)'s requirement that the petitioner shall request a hearing on the petition within thirty days after the filing of a petition to terminate parental rights. Petitioners filed the petition on October 23, 2013, and did not file a request for a hearing on the petition until April 14, 2014, well after the thirty-day deadline. And by the time final judgment was entered on November 5, 2014, over a year had elapsed since the petition was filed. The length of time it took for this case to be decided did not inure to the benefit of Child, now almost ten years old and, in fact, may well have been detrimental to him.

**Other Factors Contributing to Error in this Case**

---

[1]We note that the GAL has not participated in any way in this appeal.

**{33}** We also briefly address Petitioners' failure to meet the statutory requirements for establishing relinquishment by a parent and for providing an accounting of disbursements, and the district court's own failure to apply the correct statute. First, the sole justification asserted in the petition for seeking termination of Mother's parental rights is "on the basis of voluntary relinquishment." Yet nowhere do Petitioners demonstrate compliance with Sections 32A-5-21 and -22, which apply when a petitioner is seeking to adopt on the basis of a relinquishment of parental rights. Second, Section 32A-5-34(A) states that "[p]rior to the final hearing on a petition, the petitioner shall file a full accounting of all disbursements of anything of value made or agreed to be made by or on behalf of the petitioner in connection with an adoption." We have searched the record and found no evidence that any such report was ever filed.

**{34}** The ultimate question in considering the many aforementioned failures to comply with the Adoption Act that preceded the district court's grant of the petition is whether these failures substantially increased the risk of an erroneous decision to terminate Mother's parental rights. *See State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 37, 136 N.M. 53, 94 P.3d 796. In this regard, Mother need only demonstrate that there is "a reasonable likelihood that the outcome *might* have been different." *Id.* We conclude that the outcome might well have been different had the petition filed without a proper statutory basis been dismissed; had Mother been advised of her right to court-appointed counsel upon a showing of indigency; had a GAL been selected with proper court oversight; and had Mother not been required to spend a significant portion of her SSDI benefits on the GAL fee.

**{35}** Although we conclude that reversal is warranted for the reasons already stated, we address Mother's argument that the district court's decision to terminate her parental rights was not supported by substantial evidence and other issues related to the trial.

**The Decree Is Not Supported by Clear and Convincing Evidence and Is Erroneous as a Matter of Law to the Extent It Was Based on Alleged Abuse and Neglect**

**{36}** The standard of proof for termination of parental rights is clear and convincing evidence. Sections 32A-5-16(H) and -36(E); *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. We will affirm the district court's decision resulting in the termination of parental rights if its findings are supported by clear and convincing evidence *and* if it applied the proper rule of law. *State ex rel. Dep't of Human Servs. v. Minjares*, 1982-NMSC-065, ¶ 12, 98 N.M. 198, 647 P.2d 400. "Clear and convincing evidence" is defined as evidence that "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 2, 120 N.M. 463, 902 P.2d 1066 (internal quotation marks and citation omitted). "The function of the appellate court is to view the evidence in the light most favorable to the prevailing party, and to determine therefrom if the mind of the fact[]finder could properly have reached an abiding conviction as to the truth of the fact

11

or facts found." *State ex rel. Children, Youth & Families Dep't v. Michelle B.*, 2001-NMCA-071, ¶ 12, 130 N.M. 781, 32 P.3d 790 (internal quotation marks and citation omitted). Applying this standard here requires that we evaluate whether the district court could have found by clear and convincing evidence the necessary statutory requirements for termination. *Id.* ¶ 20; *State ex rel. Children, Youth & Families Dep't v. Patricia N.*, 2000-NMCA-035, ¶ 10, 128 N.M. 813, 999 P.2d 1045. To the extent we must interpret the Adoption Act's provisions, our review is de novo. *Helen G.*, 2008-NMSC-002, ¶ 7.

**{37}** As we have noted, the parties did not file any proposed findings of fact and conclusions of law, and the district court did not enter any findings and conclusions supporting its decisions to terminate Mother's parental rights and grant Petitioners' request to adopt Child. The court's failure to make specific findings has greatly hampered our ability to review the issues raised on appeal. Nevertheless, we have carefully reviewed the record and now address the question whether Petitioners have "present[ed] and prove[d] each allegation set forth in the petition for adoption by clear and convincing evidence." Section 32A-5-36(E); *see* § 32A-5-16(H).

**{38}** The Adoption Act authorizes the termination of parental rights when the child has been abandoned, neglected or abused, or placed in the care of others and certain conditions exist. Section 32A-5-15(B). Although Petitioners cite Section 32A-5-15 as the basis for terminating Mother's parental rights, the verified petition in this case alleged that Mother's parental rights were "being sought to be terminated on the basis of voluntary relinquishment of parental rights." Indeed, Petitioners' counsel repeatedly stated that "voluntary relinquishment" was the reason for seeking termination of Mother's parental rights. Yet there is not a shred of evidence in the record that Mother voluntarily relinquished her parental rights and, in any event, Petitioners wholly failed to meet Section 32A-5-21(A)'s clear requirement that any such relinquishment by a parent shall be in writing.

**{39}** We will then assume that Petitioners meant to seek termination of Mother's parental rights based on presumptive abandonment, as the petition's allegations track several of the conditions stated in Section 32A-5-15(B)(3) that, if proved, would establish a rebuttable presumption of abandonment. For example, the petition alleges the following: Child has lived with Petitioners since May 2013, when Child was placed there by CYFD pursuant to a safety plan; Child's sister was placed with her father in New Jersey for the same reasons; Petitioners financially support Child and provide his educational, medical, and emotional needs; a parent/child relationship has developed between Petitioners and Child; and Mother is not capable of caring for Child.

**{40}** To be clear, Petitioners nowhere assert that Child was abandoned by Mother, as set forth in Section 32A-5-15(B)(1), or that he was neglected or abused and the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future, as set forth in Section 32A-5-15(B)(2). Nevertheless, and without notice to Mother, Petitioners proceeded to trial against Mother seeking termination of her parental rights, apparently on grounds of abandonment, presumptive abandonment, and abuse and neglect. The district

12

court terminated Mother's parental rights to Child.[2] Although the allegations stated in the petition implicate only presumptive abandonment, we discuss each statutory ground.

**Abandonment**

**{41}** We easily dispense with Petitioners' contention and the district court's ruling that Mother abandoned Child. Abandonment, in its purest form, requires a complete renunciation of responsibility. There is no evidence to support the district court's determination of abandonment, let alone clear and convincing evidence.

**{42}** Mother and CYFD agreed on a safety plan for the Child's care while Mother sought intensive treatment from Life Link. The plan provided that Child, who was six-and-a-half years old at the time, would reside with Grandmother "until further reassessment by . . . CYFD." At no time did Mother indicate that she no longer wanted Child; in fact, she was hoping to get Child back by the start of the school year. There is no evidence that Mother left Child with Petitioners without communication, either by telephone or in person. To the contrary, there is unrefuted testimony that, during the summer of 2013, Mother called Child at least once a week; saw him four times between August and September; and later called him nightly. Even after Petitioners told Mother that the nightly calls were "disruptive," Mother tried to call Child two days a week. And even the GAL concluded that Mother had not abandoned Child. The district court's ruling that Mother abandoned Child is entirely unsupported by the evidence, and we reverse that ruling. As indicated below, the evidence better supports conduct by Mother for which she is to be commended: She recognized that her emotional, financial, and living conditions did not allow for the best environment for her children. She took the opportunity to locate, while she sought help, suitable alternative homes for her children until she could properly care for them. Nothing in this record—and we mean nothing—supports relinquishment, abandonment, or anything even suggesting that Mother sought to permanently yield her liberty right to the custody and care of Child.

**Presumptive Abandonment**

**{43}** A rebuttable presumption of abandonment can be raised by showing that the child has been placed in the care of others, including other relatives, whether by court order or otherwise, and by establishing the following six additional criteria:

> (a) the child has lived in the home of others for an extended

---

[2]It is unclear from the record whether the district court terminated Mother's rights on all three statutory grounds. Both the court's letter decision and the decree conclude that Child has been abused and neglected and that the causes and conditions are unlikely to change. Both also state that Child has been abandoned, citing only the presumptive abandonment statute. Because of the lack of findings from the district court, we cannot discern the legal basis for the court's decision.

13

period of time;

> (b) the parent-child relationship has disintegrated;

> (c) a psychological parent-child relationship has developed between the substitute family and the child;

> (d) if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;

> (e) the substitute family desires to adopt the child; and

> (f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.

Section 32A-5-15(B)(3).

**{44}**     In *In re Adoption of J.J.B.*, our Supreme Court addressed the requirements of the presumptive abandonment statute stating:

> [W]e have emphasized that two factors must both be established to prove abandonment: (1) parental conduct evidencing a conscious disregard of obligations owed to the child, and (2) this conduct must lead to the disintegration of the parent-child relationship. We emphasize that both factors must be established to prove abandonment, and that evidence of the disintegration of the parent-child relationship is of no consequence if not caused by the parent's conduct.

1995-NMSC-026, ¶ 44, 119 N.M. 638, 894 P.2d 994.

**{45}**     Thus, Petitioners had the burden of proving "that the objective parental conduct [is] the cause of the destruction of the parental-child relationship." *Id.* ¶ 47. The presumption of abandonment arising from proof of the factors listed in Section 32A-5-15(B)(3) "is completely rebutted by showing that a parent lacks responsibility for the destruction of the parent-child relationship." *Adoption of J.J.B.*, 1995-NMSC-026, ¶ 47.

**{46}**     Petitioners claim they proved that the statutory factors have been met by clear and convincing evidence. Specifically, they contend that Child has lived with Petitioners "for an extended period of time"; the parent-child relationship has disintegrated; a psychological parent-child relationship had developed between them and Child; and Child no longer prefers to live with Mother. *See* § 32A-5-15(B)(3)(a)-(d). As proof, Petitioners say that Child lived with them for over a year at the time of trial and, therefore, the "extended period of time" requirement has been met. They also contend that they initiated and arranged all visits between Mother and Child and that Child did not want to engage with Mother during the visits. These facts, they argue, prove by clear and convincing evidence that the parent-child relationship has disintegrated. In addition, they say, Child has known Petitioners for a long time, is bonded to them and loves them, and these circumstances establish a psychological

14

parent-child relationship. Finally, they rely on the testimony of Grandmother and Child's therapist that Child's preference was to live with Petitioners.

**{47}**    We disagree with Petitioners that there is clear and convincing evidence to support the decree on grounds of presumptive abandonment. As a preliminary matter, we note that the failure to prove any one of the statutory criteria by clear and convincing evidence is sufficient to preclude termination of Mother's parental rights, as the statute makes clear that all six conditions must exist. *See* § 32A-5-15(B)(3); § 32A-5-15(C) (stating that a rebuttable presumption of abandonment exists when the court finds that each of the six factors enumerated in Section 32A-5-15(B)(3) has been met).

**{48}**    We begin with the requirement that Child lived in Petitioners' home "for an extended period of time." The lengths of time and the surrounding facts vary in the case law, but what remains constant is deliberate action by the parent to leave the child behind or to refuse to assume parental responsibilities. While it is true that Child had lived with Petitioners for over a year at the time of trial, we conclude that this fact, standing alone, is insufficient to satisfy Section 32A-5-15(B)(3)(a) in the circumstances presented here. Child had lived with Petitioners only for about five months at the time the petition was filed. Had Petitioners followed the Adoption Act's requirement and requested a hearing within thirty days of filing, instead of waiting six months to do so, it is reasonably likely that Petitioners could not make this argument today. We discern no justification for the delay in requesting a hearing on the petition. Further, prior to the filing of the petition, and once Petitioners learned that Mother wanted Child back, they filed the TRO petition seeking to prevent Mother from having *any* contact with Child. There is little question that Petitioners have taken steps to restrict Mother's access to Child throughout these proceedings. We reject Petitioners' attempt to use their own violation of one statutory requirement (to request a hearing within thirty days of filing the petition) as evidence of compliance with another statutory requirement (that Child lived in Petitioners' home "for an extended period of time"), and conclude that the "extended period of time" requirement was not met. *See* § 32A-5-15(B)(3)(a).

**{49}**    We need go no further in reversing the district court's determination of presumptive abandonment, but nevertheless briefly address the evidence purportedly supporting the remaining statutory requirements. With regard to the disintegration of the parent-child relationship, Petitioners point to evidence that they initiated and arranged visits between Mother and Child and to Patty R.'s testimony that "most of the visits I'd have to say [Child] was not very engaged with her. He didn't want to be." We have difficulty concluding that this constitutes clear and convincing evidence that the parent-child relationship had disintegrated. *See, e.g.*, *Adoption of J.J.B.*, 1995-NMSC-026, ¶ 49 (defining "disintegration" of the parent-child relationship as the destruction of the parent's relationship with the child). Moreover, as we have discussed above, to the extent Mother's relationship with Child had disintegrated, Petitioners themselves contributed to the disintegration by thwarting Mother's efforts to have contact with Child, precluding the conclusion they seek. *See id.* (stating that a party seeking adoption of a child "must not by their own conduct have intentionally contributed to the factors causing the disintegration of the parent-child relationship").

**{50}**     In addition, although we do not doubt that Child has a bond with Petitioners, there was not sufficient evidence that "a psychological parent-child relationship [had] developed." Section 32A-5-15(B)(3)(c). That Child had extended overnight visitations with Petitioners, wanted to come home from school because he missed them, and relied on them for his home environment does not demonstrate by clear and convincing evidence the existence of a parent-child relationship.

**{51}**     Finally, the record does not establish Child's preference by clear and convincing evidence. Petitioners' argument to the contrary relies on the following: Grandmother's testimony that Child "is adamant about no longer wanting to live with [Mother]"; the testimony of Child's therapist that Child wanted to tell the judge that he wants to live with Petitioners; and the GAL's report stating that she did not ask Child where he prefers to live "because the answer was obvious." We agree with Mother that this is insufficient to support a finding that Child does not prefer to live with Mother. First, Grandmother's self-serving testimony alone cannot establish Child's preference, especially given her repeated efforts to prevent Mother from having any contact with Child (i.e., by filing the TRO petition and by limiting Mother's phone calls and visits). Second, the GAL failed entirely to perform her mandatory statutory duty to meet with and interview Child prior to the hearings and to consult with Child and convey his declared position to the court at every hearing. *See* § 32A-1-7(D), (E). The GAL met Child twice—once with Petitioners at a local restaurant, and once when she "was able to visit with [Child] and . . . Petitioners at their home." Her report states that Child "is an incredible young person; [he] is highly intelligent and charismatic"; however, this was her first encounter with Child and he "did seem somewhat guarded." At the second meeting, Child showed the GAL his bedroom and favorite things and indicated that he loves his trampoline, had planted a sunflower garden, and said that he reads every night. The GAL's report provides no other information about her interaction with Child. Yet the GAL never asked Child where he would prefer to live because, she said, "that answer was obvious." Even if Child's happiness and health at Petitioners' may be viewed as supporting this assertion, it does not establish Child's preference by clear and convincing evidence. In this regard, we note also the GAL's request for a waiver of Child's appearance at trial or for an appearance limited to the judge's chambers, based on the GAL's representation that she has "spoken to [C]hild and [C]hild does not wish to attend the hearing[,]" is unavailing. The GAL's request is inconsistent with the testimony of Child's therapist, upon which Petitioners also rely, who testified that Child wanted to tell the judge that he preferred to live with Petitioners. This inconsistency aside, because the district court granted the request to waive Child's appearance at the hearing and did not require Child to appear in chambers, Child never conveyed his preference to the court.

**{52}**     Because Petitioners failed to present sufficient evidence to support the required findings under Sections 32A-5-15(B)(3)(a)-(d), we must conclude that clear and convincing evidence does not support termination of Mother's parental rights on the basis of presumptive abandonment.

**Abuse and Neglect**

16

**{53}** This regrettable litigation has run its course as a private termination of parental rights under Section 32A-5-15 of the Adoption Act, the terms of which were construed by the district court to allow any person with a legitimate interest in the matter to petition to terminate another's parental rights by proving allegations of abuse and neglect to the district court without any involvement or oversight by CYFD. *See* §§ 32A-5-15(B)(2), 32A-5-16(A)(3). The Adoption Act's termination of parental rights provision is basically identical to that in the Abuse and Neglect Act, except it contains no definition of an abused or neglected child, and omits the requirement that CYFD or another appropriate agency make reasonable efforts to "assist the parent in adjusting the conditions that render the parent unable to properly care for the child." *Compare* § 32A-5-15(B)(2), *with* 32A-4-28(B)(2).

**{54}** That "reasonable efforts" requirement became part of New Mexico law in response to the enactment of the Adoption Assistance and Child Welfare Act, 42 U.S.C. §§ 670-79 (1980, as amended through 2015), which made federal funds available to child welfare programs that make reasonable efforts to (1) prevent the removal of children from their homes, and (2) reunify families whenever possible. *See generally In re Kenny F.*, 1990-NMCA-004, ¶ 15, 109 N.M. 472, 786 P.2d 699 ("The reasonable-efforts requirement is a central feature of recent legislation governing the protection of children."), *overruled on other grounds by In re Adoption of J.J.B.*, 1993-NMCA-145, ¶ 28, 117 N.M. 31, 868 P.2d 1256, *aff'd in part and rev'd in part by In re Adoption of J.J.B.*, 1995-NMSC-026. The Children's Code as a whole now echoes that policy: One of its primary purposes is to preserve the unity of the family when doing so is not in conflict with a child's health or safety. NMSA 1978, § 32A-1-3 (2009).

**{55}** Thus, procedures for terminating parental rights involving a child who is allegedly abused or neglected normally incorporate strictly enforced safeguards. In order to prevent the unwarranted removal of a child from her home, CYFD is the only entity that can bring a petition for abuse and neglect, *see Vescio v. Wolf*, 2009-NMCA-129, ¶ 10, 147 N.M. 374, 223 P.3d 371, and may do so only after the department has conducted an investigation, NMSA 1978, § 32A-4-4(A), (D) (2005), and the children's court attorney has determined that filing the petition is in the best interests of the child, NMSA 1978, § 32A-4-15 (1993). "An individual cannot bring [an] abuse and neglect action." *Vescio*, 2009-NMCA-129, ¶ 10.

**{56}** After "a child is adjudged neglected [or abused] under the Children's Code, the Code requires the department to provide services and to undertake efforts to attempt in the reunification of the family and further requires periodic review of the situation." *In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 9, 132 N.M. 772, 55 P.3d 984. After the adjudication, CYFD drafts a treatment plan that sets forth "services to be provided to the child and the child's parents to facilitate permanent placement of the child in the parent's home[.]" NMSA 1978, § 32A-4-21(B)(10) (2009). A dispositional hearing then takes place in which the court evaluates, among other things, CYFD's efforts at reunification. Section 32A-4-22(A)(8), (9). The dispositional hearing is followed by a permanency hearing, where parties may present evidence and cross-examine witnesses before a court can change the plan from reunification to placement for adoption with the corresponding termination of parental

rights. *See* NMSA 1978, § 32A-4-25.1 (2009). In short, the path to permanency in an abuse and neglect case—whether that means reunification, or alternatively, termination of parental rights and adoption—is staked out by a statutory scheme that contemplates CYFD's involvement at every stage, overseen by the court.

**{57}** Before 1993, Petitioners' abuse and neglect claim likely would have been dismissed as a matter of course because our statutes had only a single provision authorizing termination of parental rights on the basis of abuse and neglect, and it naturally required the court to find "that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions which render the parent unable to properly care for the child[.]" *See* NMSA 1978, § 32-1-54(B)(3) (1985), *repealed by* 1993 N.M. Laws, ch. 77, § 234; *In re Adoption of J.J.B.*, 1993-NMCA-145, ¶ 28 (concluding that termination under the abuse and neglect provision would have been improper because "there was no evidence of any efforts by the [d]epartment or other agency to assist [the father] in caring for his son"). In other words, prior to 1993, CYFD (or another appropriate agency) was plainly expected to be involved in every abuse and neglect case. That is not at all surprising in light of the purposes of the Children's Code and the Department's responsibility under federal law to make reasonable efforts at reunification whenever possible.

**{58}** When the Abuse and Neglect Act was enacted in 1993, the Children's Code was reorganized to include separate acts governing adoptions and abuse and neglect. *See* 1993 N.M. Laws ch. 77; §§ 32A-4-1 to -34; 32A-5-1 to -45. The termination of parental rights provision of Section 32-1-54(B)(3) was split in two. 1993 N.M. Laws, ch. 77, § 122; 1993 N.M. Laws, ch. 77, § 142. It became Section 32A-4-28(B)(2) in the Abuse and Neglect Act, with the reasonable efforts requirement intact, and Section 32A-5-15(B)(2) in the Adoption Act, but with no such reasonable efforts requirement. *Id.* This litigation seems to have proceeded under the assumption that the two provisions now authorize two separate methods of terminating parental rights for abuse and neglect: (1) termination of parental rights involving children in CYFD custody, governed by the Abuse and Neglect Act; and (2) proceedings where private litigants can allege and prove abuse and neglect to terminate one another's parental rights (without any department involvement or oversight) under the Adoption Act.

**{59}** That is a questionable view of the Children's Code. First, if taken literally, the Adoption Act also purports to authorize CYFD *itself* to petition for termination of parental rights under Section 32A-5-15(B)(2), *see* § 32A-5-16(A)(1), which would allow CYFD to circumvent its requirement to make reasonable efforts at reunification in abuse and neglect cases, offending both the funding conditions of federal law and the stated purposes of the Children's Code. Or CYFD could be quasi-involved, as in this case, negotiating safety plans and such, without ever conducting an investigation into the best interests of the child, filing an abuse and neglect petition, or ensuring that its efforts behind-the-scenes do not ultimately result in the unwarranted breakup of a family under cover of the Adoption Act.

18

**{60}** Second, cases where CYFD is not involved at all, and the petition for termination is brought privately under Section 32A-5-16(A)(3), would be ripe for abuse. The entire scheme of the Abuse and Neglect Act, discussed above, is designed to prevent precisely what occurred in this case. An individual's role in an abuse and neglect case is simply to report the abuse to CYFD, under criminal penalty no less, *see* NMSA 1978, § 32A-4-3(A) (2005), which then has a responsibility to initiate its investigation in accordance with the Abuse and Neglect Act, following all of the requirements stated therein. We think it highly unlikely that the Legislature intended to create under the Adoption Act a parallel scheme that can effectively remove CYFD from abuse and neglect cases. The Children's Code is to be read as a whole, so that the legislative intent is properly realized. *State v. Adam M.*, 2000-NMCA-049, ¶ 10, 129 N.M. 146, 2 P.3d 883. Moreover, the literal meaning of a statute also does not control "when such an application would be absurd, unreasonable, or otherwise inappropriate." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939; *see State v. Trujillo*, 2009-NMSC-012, ¶ 21, 146 N.M. 14, 206 P.3d 125 (stating that the court will reject the plain meaning "in favor of an interpretation driven by the statute's obvious spirit or reason" if adherence to the literal words would lead to "injustice, absurdity or contradiction" (internal quotation marks and citations omitted)); *State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 ("[The appellate courts have] rejected a formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute."); *Atchison, T. & S. F. Ry. Co. v. Town of Silver City*, 1936-NMSC-036, ¶ 13, 40 N.M. 305, 59 P.2d 351 ("Canons of construction are but aids in determining legislative intent and are not controlling if they lead to a conclusion, which by the terms or character of the legislation manifestly was not intended." (citation omitted)). In our view, the only construction of Section 32A-5-15(B)(2) consistent with the rest of the Children's Code is that the Adoption Act's abuse and neglect provision refers to abuse and neglect as defined in the Abuse and Neglect Act, and that CYFD's involvement is required by reference, which in turn requires all the safeguards set forth in the Abuse and Neglect Act, including the requirement that CYFD make reasonable efforts to reunify a child with her natural parent whenever possible. Such a construction is additionally consistent with the constitutional liberty interest at stake when a parent is faced with termination of her right to raise and have a relationship with her child.

**{61}** The parties have not briefed the issue and, we need not and do not expand on it any further. Even assuming that private litigants can terminate another's parental rights by proving abuse and neglect in a civil case, the evidence was insufficient to do so in this case. We first discuss the evidence and testimony erroneously admitted at trial and relied upon by the district court in reaching its decision. We then examine the only competent evidence of record and conclude that it was plainly insufficient to terminate Mother's parental rights on the basis of neglect and abuse.

**{62}** "We review the admission of evidence for abuse of discretion." *Couch v. Astec Indus.*, 2002-NMCA-084, ¶ 8, 132 N.M. 631, 53 P.3d 398. "The district court abuses its discretion when its ruling is based on a misunderstanding of the law." *State v. Phillips*, 2006-NMCA-001, ¶ 10, 138 N.M. 730, 126 P.3d 546, *overruled on other grounds by State v.*

*Guthrie*, 2011-NMSC-014, 150 N.M. 84, 257 P.3d 904. The erroneous admission of evidence does not constitute reversible error unless it is apparent that the court considered such evidence in deciding the case. *Davis v. Davis*, 1972-NMSC-045, ¶ 9, 83 N.M. 787, 498 P.2d 674.

**{63}** We begin with the GAL's amended report, which the district court admitted over Mother's objection and said it would consider in making its decision. The admission of the GAL's preliminary and amended report was problematic in three critical ways. First, the initial report was hand-delivered to Mother's counsel on July 15, 2014, the first day of trial. Mother's counsel clearly did not have an adequate—indeed any—opportunity to adequately review the report before the commencement of the hearing that day. Next, the amended GAL report, without prior notice of the amendment, was hand-delivered to Mother's counsel at the beginning of the second day of trial on July 25, 2014. Although Mother's counsel did not argue prejudice based on the late filing and delivery of these reports, we are troubled that this might well have impacted his ability to adequately prepare Mother's defense. *See Lorena R.*, 1999-NMCA-035, ¶ 25 (stating that parents have a due process right to participate meaningfully in termination of parental rights cases, including the right to review and challenge the evidence presented against them). Notice issues aside, the GAL's amended report was improperly admitted into evidence.

**{64}** That report, while substantially similar in substance to the original report filed July 15, 2014, was amended by attaching eighteen pages of allegations against Mother from CYFD's files. Our close review of these attachments reveal that many of the allegations were anonymous, most were found by CYFD to be unsubstantiated, and all were hearsay statements. The district court overruled Mother's objections that the report and attachments contained hearsay and that the GAL was required to offer witnesses to testify about the contents of the documents.[3] The court ruled that the report and file excerpts were admissible under Rule 1-053.3(F). As discussed above, the court erred as a matter of law in relying on Rule 1-053.3. Moreover, Petitioners cite no case holding that inadmissible hearsay testimony is admissible simply because it is proffered by a GAL, let alone in a proceeding implicating a parent's fundamental due process rights. A GAL is not legally authorized to circumvent applicable rules of evidence by attaching inadmissible hearsay documents to a report. The district court should not have admitted the GAL's amended report or relied upon it in determining whether to grant the petition.

---

[3]Further complicating matters, Mother's counsel objected to the admission of the GAL's amended report at the conclusion of the July 25, 2014 hearing. The district court accepted the report into evidence but then set a hearing ten days later for Mother to respond to the GAL's allegations and hearsay reports. The court made no determination of admissibility prior to accepting the report and then shifted the burden to Mother to rebut the allegations in the report and CYFD notes. There is no legal justification for the court's actions in this regard.

**{65}** The failure of witnesses to timely provide documents was not limited to the GAL. CYFD worker Kurt Smith, who had no personal knowledge of the case, had never even seen the safety plan prior to the trial and was only "vaguely familiar" with Mother, was allowed to testify about CYFD records pertaining to Mother. Mother's counsel had served subpoenas for the records prior to trial, but they were not produced. Yet the district court overruled Mother's counsel's objection and allowed Smith to testify about notes and other written records containing numerous inadmissible hearsay statements. Similarly, Mother's attorney subpoenaed and did not receive the treatment notes of Child's counselor, Mary Carafelli. In fact, Carafelli did not bring those notes to court but produced only a file containing a handful of forms. The district court overruled counsel's objection that Carafelli's refusal to produce her file should bar her testimony and ordered Carafelli to produce her file within a week. It is unclear whether she ever complied with that order, but no such documents appear in the record. In our view, with nothing in the record to show otherwise, the district court's rulings denied Mother her rights to confront and cross-examine the witnesses against her. *See Maria C.*, 2004-NMCA-083, ¶ 34 (holding that "parents have a due process right to fair notice and an opportunity for meaningful participation . . . , including the right to present evidence and cross[-]examine witnesses"). Under the circumstances presented here, the district court should not have allowed or relied on the testimony of Kurt Smith and Mary Carafelli.

**{66}** Excluding consideration of the foregoing inadmissible evidence, Petitioners' evidence in support of allegations of abuse and neglect and that this alleged circumstance was unlikely to change in the foreseeable future can be summarized as follows: Mother's living environment was dirty, in disarray, and with bed bugs "all over," Child was dirty, hungry, withdrawn and scared, behind in school, exposed to domestic violence, and traumatized; Mother was also dirty, her hair was greasy, and she smelled of alcohol and body odor; Mother's apartment was near an empty lot that was full of needles, glass, liquor bottles, debris, sleeping bags, and mattresses; Mother was destructive and violent; and Mother drank almost every day and sometimes used drugs.

**{67}** We accept for the purposes of our discussion that this evidence, if established, might provide a basis for finding abuse and neglect. The question becomes whether, to the extent that the alleged circumstances truly exist, they demonstrate clearly and convincingly that Mother's condition warranted a termination of her parental rights.

**{68}** We first turn to Mother's housing. The chief complaints from Petitioners were that Mother's homes were filthy and infested with bed bugs, and that she lived near an empty lot filled with trash and drug paraphernalia. Although one's housekeeping habits could form the basis of a legitimate petition for neglect, there is no evidence in the record that Mother's situation was seriously detrimental to Child, and no evidence that Child had ever been harmed in Mother's household. That Mother's cleanliness did not meet Petitioners' approval cannot be the basis for terminating Mother's parental rights. *See State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 21, 132 N.M. 299, 47 P.3d 859 (stating that "[t]he fact that a child might be better off in a different environment is not a basis for termination of parental rights in this state" (internal quotation marks and citation omitted)).

Nor are we prepared to say that the fact that Mother's previous apartment was near an empty lot with trash and possible drug paraphernalia constituted neglect or abuse. After all, Mother could hardly be expected to obtain an apartment that was not "low income" given the amount of her monthly SSDI. Finally, we note that Petitioners provided no evidence at the time of trial that Child would not be safe in Mother's home.

**{69}** To the extent that Petitioners contend that Mother was unfit because Child was withdrawn, scared, and traumatized, there was no competent evidence to support these assertions. There was no evaluation or diagnosis of Child (or of Mother), and scant testimony concerning Mother's interaction with Child. Patty R. testified that Mother was "a little bit more talkative" with Child than she was with her daughter. Lee Carrizales, a friend of Mother's, testified that Mother loves Child "in her own way," but she did not act lovingly or patiently with her children. Even if we agree that Mother did not interact with Child at a level that would ensure that Child necessarily will experience maximum emotional development, there was insufficient evidence to satisfy the strict requirements for termination of parental rights.

**{70}** We briefly address the allegations of drug and alcohol use and Mother's alleged violent tendencies. Lee Carrizales testified that Mother drank alcohol "pretty much every day" and that she used drugs. Carrizales' testimony regarding Mother's alcohol use was based on her observations in the summer of 2009 when Mother, her boyfriend and the children lived with Carrizales. She said that she knew Mother used street drugs "because they would discuss it" and because she found a pipe in her shed. Although Mother testified that she used to drink, she said that she was sober and no longer drank alcohol. Doug Simon, who had been in a relationship with Mother more than thirteen years earlier, testified that their relationship was "[a]t some points . . . loving and at others, highly toxic, volatile, destructive." Yet, Simon allowed Mother to raise their daughter until Mother sent their daughter to live with Simon pursuant to the safety plan. In any event, the record does not provide evidence that supports "an abiding conviction" in our mind, *see In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 2, that Mother was drinking or using drugs at the time of trial, or that she was emotionally unstable at the time of trial, let alone that these conditions would continue into the foreseeable future.

**{71}** Perfection in parenting is not attainable, but neither is it required by law. Under the circumstances, Mother's decision to have Child reside in a relative's home where he would receive adequate care does not evidence a failure to provide proper and necessary support for Child constituting abuse and neglect but rather concern for Child. Petitioners have failed to meet their burden to demonstrate by clear and convincing evidence that termination of Mother's parental rights was warranted.

**{72}** We recognize that our decision may have significant emotional consequences for Child who, by now, has lived with Petitioners for over three years. But applicable law does not permit the termination of parental rights where, as here, the district court applied the law incorrectly and failed in its duty to ensure that the proceedings were conducted with

22

scrupulous fairness. Consequently, we reverse.

**CONCLUSION**

**{73}** For the foregoing reasons, we reverse the judgment terminating Mother's parental rights to Child, and void the proposed adoption.

**{74}    IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**J. MILES HANISEE, Judge**